SYLVIA BERNIER, ADMINISTRATRIX (ESTATE OF WALTER F. BERNIER) *v.* NATIONAL FENCE COMPANY

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, JS.

Argued December 12, 1978—decision released February 20, 1979

*Milton L. Jacobson,* with whom was *Carl D. Anderson,* for the appellant (plaintiff).

*Thomas J. Groark, Jr.,* with whom was *Sharon S. Tisher,* for the appellee (defendant).

BogdanSKi, J. On March 28, 1972, the plaintiff's decedent, an employee of the state highway department, was fatally injured while working as a member of a highway crew in the town of Killingly. At the time of the decedent's death the defendant, the National Fence Company, was engaged, pursuant to

a contract with the state of Connecticut, in excavating post holes for the erection of a large sign to be located at the intersection of routes 12 and 6. The accident, which resulted in the decedent's death, occurred when a truck-mounted hole digger, operated by employees of the defendant, came into contact with high tension wires overhead, resulting in electrical shock to the defendant's employees. The plaintiff's decedent, who was working nearby, rushed to the scene and in attempting to rescue the employees was himself electrocuted.

This case involves an appeal taken from the judgment rendered upon a verdict for the defendant in the wrongful death action brought against the National Fence Company by the plaintiff, Sylvia Bernier, as administratrix of the decedent's estate. The plaintiff's complaint alleged that the decedent's death was caused by the negligence of the defendant, in that its employees operated the post hole digger in close proximity to overhead power lines without notifying the power company and without requesting that the power be shut off. In its answer the defendant denied that it or its employees were negligent and alleged by way of special defense contributory negligence and assumption of risk on the part of the decedent. The state of Connecticut intervened as coplaintiff, pursuant to § 31-293 of the General Statutes, in order to recover the workmen's compensation benefits paid to the decedent's widow and children. The intervening complaint, however, was not read to the jury and the state did not participate in the trial.

Trial began on Thursday, December 4, 1975, and, at the conclusion of the evidence on that day, the court recessed until Tuesday, December 9. On

Tuesday, the second day of trial, the court called counsel into chambers and advised them that it had been informed that a newspaper article concerning the case had appeared in the New London Day newspaper on Saturday, December 6, 1975, and that the article included a reference to the ad damnum clause of $500,000. The court informed counsel that it was unable to give them any other details as the court had not itself seen or read the article. The court further advised counsel that on Thursday, December 4, it had been approached by a reporter for the New London Day who requested and was granted permission to examine the pleadings in the case. After the court's recitation, counsel made no further inquiry of the court regarding these matters.

The court then called the jury into the courtroom and inquired whether any of the jurors had read the newspaper article concerning the case. Only one of the jurors, Philip Nahas, indicated that he had. The court thereupon excused the rest of the jurors and asked Nahas whether he had discussed the article with anyone on the jury. Nahas answered that he had not. The court then admonished Nahas as follows: "Please . . . put that out of your mind completely. . . . I am going to ask you please not to discuss it at all with any of the other jurors," and further instructed him that "[t]hey [the jurors] are not to ask any questions about the article, not to go looking for the article." When the court asked counsel whether they had any questions to ask of Nahas, counsel replied that they had no questions. The court then offered counsel the opportunity of having Nahas excused from jury duty. This offer was, however, declined by counsel.

The court thereupon called back the rest of the jurors and instructed them not to look for the arti-

cle, cautioning them that if any further articles concerning the case should appear, they were to avoid reading them. The court then admonished the jury as follows: "We don't want you to be influenced one way or the other, favorably or unfavorably, to either side in the matter. We want you to make the determination based upon what you hear here in the courtroom after hearing all of the evidence, all of the witnesses upon examination and cross-examination . . . . What we really want is a fair, impartial, intelligent determination by this jury of the merits of this particular case; so please don't seek out information that does not pertain to you and don't seek out any information that might unduly prejudice you."

Not until January 7, 1976, after a verdict for the defendant had been returned, did the plaintiff obtain and read the aforementioned article. It was then discovered that the last paragraph of the article mentioned that the state of Connecticut was a coplaintiff in the suit and was seeking reimbursement for the workmen's compensation benefits which it had paid to the decedent's wife and children. The plaintiff thereupon filed a motion in arrest of judgment and a motion for a new trial on the ground that the jury had been prejudiced by Nahas' exposure to the reference to workmen's compensation in the newspaper article.

The plaintiff has briefed and argued the following claims: (1) that the newspaper article, read by at least one juror, was prejudicial to the plaintiff; (2) that the court erred in denying a new trial when "the court had been instrumental in causing the article to be published, in giving erroneous and belated information to counsel, and in failing to take ade-

quate and thorough steps to cure any prejudicial effect occasioned by the article itself"; and (3) that the court erred in admitting into evidence work rules pertaining to employees of the state of Connecticut, thereby allowing an issue to be raised which was not framed by the pleadings, i.e., the defendant's claim that the state, although not a party to the action, was negligent and that the negligence of the state was the proximate cause of the injuries to the decedent.

The plaintiff argues first that the court was "instrumental in causing the article to be published," and therefore that the court had a "unique obligation" and special duty to conduct a thorough investigation in order to assure itself that any prejudicial information in the article so published had not reached the jury. The basis for this claim appears to be the court's action in permitting the intervening complaint, together with other pleadings in the court file, to be examined by the newspaper reporter for the New London Day. That argument is, however, based upon the misconception that the court had authority to deny the reporter access to the intervening complaint. The intervening complaint and the other pleadings in this case are public records under the Freedom of Information Act, § 1-19 of the General Statutes, and, as a result, the court was without discretion to deny access to these records.

Moreover, the record reveals clearly that the plaintiff was timely put on notice that a newspaper article of potentially prejudicial content was published and read by one of the jurors. If the plaintiff believed, for any reason, that the court's cautionary instructions to that juror or to the panel as a whole were insufficient, it was incumbent upon the plain-

tiff to make a request for such remedial action as was felt necessary, at that time, and not to reserve possible objections until after an adverse verdict was rendered. The plaintiff cannot claim error based upon a lack of knowledge of the precise contents of the article in question when that lack of knowledge was the result of the plaintiff's failure to act upon the warning timely given by the court.

A motion for a new trial is addressed to the sound discretion of the trial court and "will never be granted except on substantial grounds." *Black* v. *Universal C.I.T. Credit Corporation,* 150 Conn. 188, 193, 187 A.2d 243 (1962). A motion for a new trial for extrinsic causes will not be sustained if the ground of it existed at the time of trial, and was either known to the petitioner at the time of trial, or might have been known through the exercise of reasonable diligence. 1 Swift's Digest Revised (Dutton Ed.), p. 816. "There can be but little difference, in legal effect, between actual knowledge . . . by the defendants, at the time of trial, and their . . . negligence in not ascertaining it. And it would be unjust to subject the plaintiffs to a new trial, by reason of such negligence." *Quinebaug Bank* v. *Leavens,* 20 Conn. 86, 89 (1849); see also *Yavis* v. *Sullivan,* 137 Conn. 253, 264, 76 A.2d 99 (1950). The rule, long ago enunciated by this court, is that "if it does not appear that [the juror misconduct in question] was occasioned by the prevailing party, or any one in his behalf; if it do[es] not indicate any improper bias upon the juror's mind, and [if] the court cannot see, that it either had, or might have had, an effect unfavourable to the party moving for a new trial; the verdict ought not to be set aside." *Pettibone* v. *Phelps,* 13 Conn. 445, 450 (1840); *Brodie* v. *Connecticut Co.,* 87 Conn. 363, 368, 87 A. 798 (1913).

We conclude in view of the above that the court did not err in denying the plaintiff's motions in arrest of judgment and for a new trial.

The plaintiff next contends that the court erred in admitting into evidence the Connecticut department of transportation's "Handbook of Safe Practices," claiming that the admission of that handbook enabled the defendant to raise the issue of the alleged negligence of the state, an issue not framed by the pleadings. The defendant in turn claims that it had the right, under its general denial, to introduce affirmative evidence that the negligence of another, i.e., the state, was the sole proximate cause of the decedent's death.

The distinction between matters which may be proved under a general denial and matters constituting special defenses, which must be specially pleaded, was enunciated in *Pawlinski* v. *Allstate Ins. Co.*, 165 Conn. 1, 327 A.2d 583 (1973), where this court observed (p. 6) that "[t]he issues to be tried may be framed in several ways. A denial of a material fact places in dispute the existence of that fact. Even under a denial, a party generally may introduce affirmative evidence tending to establish a set of facts inconsistent with the existence of the disputed fact. *Caslowitz* v. *Roosevelt Mills, Inc.* [138 Conn. 121, 123–25, 82 A.2d 808 (1951)]; James, Civil Procedure § 4.7; 1 Stephenson, Conn. Civ. Proc. (2d Ed.) § 126 (g), p. 517. If, however, a party seeks the admission of evidence which is consistent with a prima facie case, but nevertheless would tend to destroy the cause of action, the 'new matter' must be affirmatively pleaded as a special defense."

By introducing evidence that the state of Connecticut was the sole proximate cause of the decedent's death, the defendant was seeking to establish a set of facts inconsistent with the plaintiff's allegation that the proximate cause of the injuries to the plaintiff's decedent was the negligence, whether sole or concurrent,[1] of the defendant. We find that while that defense involved evidence of an affirmative character, the evidence was inconsistent with a prima facie case and was therefore properly admitted under a general denial. See *Pawlinski* v. *Allstate Ins. Co.*, supra, 7.

We conclude that the trial court did not err in admitting the challenged evidence.

There is no error.

In this opinion the other judges concurred.

---

[1] The record reveals that the court charged the jury thoroughly and accurately with respect to the issue of concurrent negligence.