Rosen, J.,
concurring: I join in the majority opinion as to all issues decided in this matter. I write separately only to address any confusion or perceived inconsistency that may result from finding error in the State’s use of my dissenting opinion from Tahah’s first appeal in the retrial’s closing argument. State v. Tahah, 293 Kan. 267, 280-84, 262 P.3d 1045 (2011) (Rosen, J., dissenting).
My dissent was meant to express my dismay as to the necessity of lesser included offense instructions pursuant to K.S.A. 22-3414(3), which resulted in reversal of Tahah’s first trial. It was not meant to be a blueprint for closing argument in the subsequent proceeding where the legal parameters have been established by this court’s remand requiring inclusion of lesser included offenses.
While it has been said that “imitation is the sincerest form of flattery,” I want to caution that any such duplication must be carefully considered and placed in the proper context so as to maximize the effectiveness of its use.
# # ⅜
Johnson, J.,
concurring: I agree with the majority’s determination that the trial court’s orally delivered preliminary jury instruction was not clearly erroneous. But I reach that conclusion because I am firmly convinced that, if the trial judge had omitted the parts of the pretrial instruction soliloquy that I deem erroneous, it would not have impacted the result of the trial. Cf. State v. Salts, 288 Kan. 263, 266-67, 200 P.3d 464 (2009) (although error to instruct jury that “another trial would be a burden on both sides,” it was not clearly erroneous in that case).
I cannot, however, accept the majority’s declaration that it was legally and factually appropriate to instruct the juiy that a mistrial *797 requires the restarting of the entire trial process and that a mistrial is a tremendous expense and inconvenience to all concerned, including taxpayers. The rationale utilized in Salts is equally applicable here, i.e., the attempted coercive instruction directs the jurors to consider matters that are beyond the scope of their role in the criminal justice system and the instruction statement is not true in all respects.
Before addressing the majority’s reasoning, I pause to describe and quote more extensively from the district court’s preliminaiy instruction. In my view, one must consider the context in which the jury received the challenged instruction language in order to assess its potential impact.
The court began by stating the general proposition that the jury was to decide the case solely on the evidence, applying the court-instructed law to the evidence to obtain a verdict. The court specifically admonished the jury that it was “very important” that “[i]n order for your verdict to be fair, you must not be exposed to any other information about the case, the law or any of the issues involved in this trial during the course of your jury duty.” That admonishment was followed by “some veiy detailed explanations about what [the jurors] should do and not do” while serving as jurors.
Those detailed explanations included prohibiting any attempt to get information from any source outside the courtroom by talking to friends or family, reading any printed or electronic material, using any electronic device to access any outside source, or doing any personal investigation, such as visiting the crime scene or using Google Earth. Further, the judge warned the jurors not to talk to any potential witness or create any reenactments of the events and not to communicate with anyone about the case or their juiy service “by using cell phones, e-mails, text messages, tweets, blogs, chat rooms, comments or other posting on Facebook, Myspace, Linkedin, or any other social website.” The communication ban also applied to family members, employers, and people involved in the case, except that a juror could inform family members or an employer that he or she had been seated as a juror.
*798 The court acknowledged that its rules and restrictions asked the jurors to refrain from engaging in common and important everyday-activities, but it informed the jurors that “the law requires these restrictions to insure the parties have a fair trial based upon the evidence that each party has had an opportunity to produce and discuss.” The judge further explained that the reason it was so important that the jury base its verdict only on information that it received in the courtroom was because information obtained from an outside source “might be inaccurate, or incomplete, or for some other reason not applicable to this case,” and that the parties would not have a chance to explain or contradict the outside information because they would not know that it exists. That led the court into the language giving rise to this appeal challenge, which is italicized below:
“You must not engage in any activity or be exposed to any information that might unfairly affect the outcome of this case.
“Any juror who violates these restrictions I have explained to you jeopardizes the fairness of these proceedings, and a mistrial could result. That would, require the entire trial process to start over. As you can imagine, a mistrial is a tremendous expense and inconvenience to the parties, the Court and the tax payers.” (Emphasis added.)
The court did not end its instructions at that point. It went on to direct the jurors to report any exposure to outside information, any outside contact, or any juror misconduct by others, either to the court or to the bailiff. The court then clarified that its instructions were not merely a pretrial matter, but rather “[tjhese restrictions must remain in effect throughout this trial.” Indeed, the court made it clear that what it was saying in its preliminary instruction was to carry through to the end of the trial when it talked about how the jurors should approach deliberations. That part of the preliminary instruction dealing with deliberations culminated with the statement that “[i]f every juror is fair and reasonable, a jury can almost always agree” on a verdict.
Turning back to the majority opinion, it is noteworthy that it acknowledges that a written Allen-type instruction given to the jury at the close of trial, such as the one given in Salts, presents well-grounded concerns. The majority describes those concerns as the *799 risk that the instruction can improperly coerce a unanimous verdict and the fact that the instruction s content “has rightly been described as factually inaccurate.” 302 Kan. at 795. The majority then attempts to distinguish the preliminary instruction given in this case as having a character and purpose that are entirely different. That distinction cannot withstand closer scrutiny.
The majority inexplicably relies on the timing of the instruction to support its different-character contention, stating that “[t]he instruction occurred at the start of trial, before the presentation of evidence.” 302 Kan. at 795. Then, in assessing the impact of a mistrial, the majority suggests that it should be “viewed from the pretrial vantage point of the parties” (302 Kan. at 795.) the apparent suggestion being that the preliminary instruction was addressing potential juror misconduct, and the resultant mistrial, that might occur at the beginning of a trial before evidence is presented. But, of course, that is not the case.
The district court’s explanation of the restrictions on the jurors’ conduct encompassed activities that could occur throughout the entire trial, including deliberations. And if the explanations were not obvious enough, the judge specifically told the jurors and the parties that the restrictions on juror conduct “must remain in effect throughout this trial,” until after a verdict was delivered. It even lectured the jury on how it should conduct itself during deliberations, notwithstanding the instruction’s pretrial vantage point. In short, I fail to see the relevance of the fact that the consequences-of-mistrial instruction was given before commencement of trial when the court made it applicable to the entire trial.
Moreover, frequently, when juror misconduct occurs, or is discovered, it happens or has happened during the jury’s deliberations after the close of evidence. See, e.g., State v. Bell, No. 111,265, 2015 WL 2414344, at *4-5 (Kan. App. 2015) (unpublished opinion) (after verdict, juror informed court that during deliberations, another juror had said defendant banned from other Wal-Mart stores); State v. Fulton, 269 Kan. 835, 838, 9 P.3d 18 (2000) (during deliberations, presiding juror informed court that a juror had introduced outside prejudicial information about defendant’s brother to jury); Saucedo v. Winger, 252 Kan. 718, 723, 850 P.2d 908 *800 (1993) (during deliberations, juror told of daughter attending school with defendant); State v. Arney, 218 Kan. 369, 371, 544 P.2d 334 (1975) (juror introduced results of personal investigation during deliberations, which jury discussed); Butler v. HCA Health Svcs. of Kansas, Inc., 27 Kan. App. 2d 403, 407, 6 P.3d 871, rev. denied 268 Kan. 885 (1999) (during deliberations, juiy discussed rejected settlement offer, government benefits available to plaintiff, and possible effect of verdict on defendant physicians); Johnson v. Haupt, 5 Kan. App. 2d 682, 685, 623 P.2d 537 (1981) (news article introduced into deliberations). Thus, at least the parties’ attorneys should not have viewed the district court’s consequences-of-mistrial warning as a pretrial matter, and I have to believe that a rational jury would have understood the preliminary instruction as a warning that a mistrial could occur at any time before a verdict was rendered.
The majority declares that the instruction’s coercive effect—to prevent juror misconduct—is entirely proper and, therefore, justified. From that end justifies the means mindset, the majority takes a giant leap of logic to conclude that, because the purpose of the instruction is proper, it must be “factually accurate.” 302 Kan. at 795. I disagree on several levels.
The majority’s ends-justifies-the-means rationale suggests that the district court’s tremendous expense and consequences warning only applied where there was juror misconduct. But the district court stated that the consequences flowed from starting the trial process over. A fair reading of the instruction is that juror misconduct could result in a mistrial; a mistrial is the circumstance where the entire trial process starts over; and starting the trial process over is a tremendous expense and inconvenience to the parties, the court, and the taxpayers. Consequently, a reasonably intelligent juror would understand that when the district court subsequently tells the jury that if every juror is fair and reasonable they should almost always reach an agreement, it is implying that if they do not reach an agreement, the entire trial process will start over and cause a tremendous expense and inconvenience to everyone, including taxpayers. In other words, the warning that a tremendous expense and inconvenience results from a retrial after mistrial ap *801 plies equally to a hung jury mistrial as it does to a juror misconduct mistrial. The district court did not distinguish the consequences of a juror misconduct mistrial from the consequences of a hung jury mistrial, and neither does the majority. I submit there is no distinction.
Even if one views the consequences-of-mistrial warning as only applicable to a mistrial based on juror misconduct, it was unnec-essaiy and ineffectual for that purpose. The “grave costs” of juror misconduct to which the majority alludes, including damaging “the integrity of our jury trial criminal justice system itself,” were adequately addressed by the preliminary instructions that preceded the challenged language. 302 Kan. at 795. The district court carefully explained the conduct that was improper and laid out specifically why the misconduct would be prejudicial to the parties and would jeopardize the fairness of the proceedings. The court’s admonition that juror misconduct “jeopardizes the fairness of these proceedings” is broad enough to encompass the majority’s “right to a speedy resolution of the criminal allegations,” as well as the alleged consequences-of-mistrial economic hardships. 302 Kan. at 795. While tire court’s appeal-to-fairness statements were arguably coercive, they were unquestionably factually and legally appropriate, as well as being consistent with the role the jury is assigned in our criminal justice system, as will be discussed below. Moreover, no further coercion was necessary. If the prospect of being unfair to the parties is not enough to prevent a juror from breaking the judge-stated rules, it is difficult to imagine that the threat of visiting economic hardship upon die parties would shock that juror into submission.
Setting aside the question of whether fairness is an insufficient coercive agent, it is nevertheless incumbent on the court to speak the truth to the jury. Unlike tire majority, I would not equate nobility of purpose with factual accuracy. The statement that a mistrial “would require the entire trial process to start over” is a sometimes truth. The State might see that its case has evanesced and decide not to continue the prosecution. A defendant might realize that the evidence is overwhelming and agree to enter a guilty plea. The parties might realize that the case begs for a plea bargain. In *802 all of those scenarios, the entire trial process would terminate, rather than start over.
Likewise, the hyperbolic declaration that a mistrial would be a “tremendous expense and inconvenience” needs further qualification. If the trial does not, in fact, start over, then the mistrial has not caused the parties, the court, or the taxpayers the stated burden. Furthermore, even if the trial starts over, the indigent defendant with court-appointed counsel will not incur “tremendous expense,” at least in short term. More globally, to tire extent the judicial branch budget is funded by court filing fees, the taxpayers’ skin in the game is de minimis. In short, if we permit the trial court to use a “scared straight” instruction with the juiy, the content of the instruction should be completely accurate.
Having quibbled with the majority’s rationale, I conclude with the principal reason that the district court erred in giving the consequences-of-mistrial warning. That reason is that the jury should stay focused on its role and not be concerned with what happens after it is discharged. The jury’s role in this trial was aptly described by the district court in its Instruction No. 2, given to the jury after tire close of evidence, which stated: “Your only concern in this case is determining if the Defendant is guilty or not guilty. The disposition of the case thereafter is a matter for determination by the Court.” See also Shannon v. United States, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994) (“The jury’s function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged.”). As in Salts, the preliminary instruction and Instruction No. 2 sent a mixed message to the jury. 288 Kan. at 266. Moreover, the jurors should not be concerned with the amount of resources the parties or the district court might have to expend in order to afford the defendant a fair trial, and they are certainly not the guardians of the taxpayers’ interest in the judicial branch budget. Telling the jurors that they must consider what occurs after the court declares a mistrial is akin to having them consider the sentence that might be imposed after they render a verdict, which our Supreme Court has said “invites them to ponder matters that are not within their province, distracts them *803 from their factfinding responsibilities, and creates a strong possibility of confusion.” Shannon, 512 U.S. at 579.
Accordingly, I would declare the consequences-of-mistrial portion of the district court’s oral preliminary instruction to be erroneous, albeit not clearly erroneous.
Beier arid Biles, JJ., join in the foregoing concurrence.